# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **RUTH NUNEZ** | : | |
| **Plaintiff** | : | **No. 3:18-cv-1952 (VLB)** |
| | : | |
| **v.** | : | |
| | : | |
| **ANDREW SAUL,** | : | **February 28, 2020** |
| **COMMISSIONER OF SOCIAL** | : | |
| **SECURITY** | : | |
| **Defendant.** | : | |
| | : | |

## MEMORANDUM OF DECISION AFFIRMING DECISION OF COMMISSIONER AND DENYING MOTION TO REVERSE AND REMAND

Ruth Nunez ("Ms. Nunez" or "Plaintiff" or "Claimant") challenges the Commissioner of Social Security now Andrew Saul's[1], final decision to deny Ms. Nunez's application for disability benefits pursuant to 42 U.S.C. § 405(g). Ms. Nunez moves *pro se* to reverse and remand Administrative Law Judge Eskunder Boyd's (the "ALJ") decision as not supported by substantial evidence in the record and/or not rendered in accordance with law. [Dkt. 15 (Pl. Mot. to Rev.)]. Defendant Andrew Saul ("Defendant" or "Commissioner") moves to affirm the Commissioner's final decision, as expressed by the ALJ decision. [Dkt. 16 (Def. Mot. to Affirm)]. For the reasons stated below, the Court GRANTS Defendant's motion to affirm [Dkt. 16] and DENIES Claimant's motion to reverse and remand [Dkt. 15].[2]

---

[1] Andrew Saul is automatically substituted as a party pursuant to Fed. R. Civ. P. 25(d).

[2] A second motion to reverse and remand appears on the docket. [Dkt. 17]. That motion is unaccompanied by a memorandum of law as required by D. Conn. L. R. Civ. P. 7(a). Moreover, the motion is signed by Ms. Evelyn Rosa, who is neither a party to this case nor entered an appearance as an attorney of record for Ms.

## Background

### I. Procedural Background

Ms. Nunez was born in 1962 and previously worked as an office clerk. [Dkt. 15 (Pl. Mot. to Reverse) at 2]; [Dkt. 12 (Record) at 28].[3] She filed an application for Title II benefits on November 10, 2015, alleging a disability onset date of April 10, 2014. [R. 17]. The claim was initially denied on February 2, 2016 and again on reconsideration on May 3, 2016. *Ibid*. Ms. Nunez moved for a hearing, which was held before ALJ Boyd on October 5, 2017. *Ibid*. She testified at the hearing with the assistance of a Spanish language interpreter and was represented by counsel. *Ibid*. The ALJ issued his decision on October 19, 2017, denying Ms. Nunez's claim for benefits because he found that Ms. Nunez's Residual Functional Capacity ("RFC") rendered her able to perform relevant past work as an office clerk. [R. 28]. The Social Security Appeals Council declined to hear her appeal on October 4, 2018. [R. 5-10]. A timely petition for judicial review followed. [Dkt. 1 (Compl.)].

### II. Relevant Medical History

The medical record begins roughly two and a half years before the October 2017 hearing and reflects various physical maladies and mental health conditions.

---

Nunez. Pursuant to Fed R. Civ. P. 11(a) every written motion be signed by either a party appearing pro se or an attorney of record. Accordingly, [Dkt. 17] is also DENIED.

[3] Citations to the record, [Dkt. 12], are identified as [R. __]. The ALJ's opinion comprises [R. 17-29].

In May 2014, Ms. Nunez was seen by her primary care physician, Dr. Cynthia Gentes, for anxiety that increased after her father died and she was laid off from her job, and for headaches. [R. 407]. Dr. Gentes observed normal demonstrated behavior, mood, and affect during the examination. [R. 408]. She was also seen in May 2014 for anemia and treated with an intravenous iron infusion. [R. 369-70].

Ms. Nunez was seen by Dr. Gentes again in August 2014 for headaches and anxiety. [R. 416-20]. Ms. Nunez reported that her anxiety was improving with the new medication regiment and that she had no loss of interest in activities. [R. 416]. Her neurological and psychiatric assessments were normal. [R. 417-18]. Ms. Nunez continued to treat with hematologist Dr. Sandhya Dhanjal for anemia. [R. 363-76].

In October 2015, Ms. Nunez experienced sudden deafness in her left ear and underwent an MRI with contrast, but the findings were unremarkable. [R. 289]. The radiologist found that her brain was stable when compared to 2011 imaging. *Ibid*. Her audiologist's report reflects that Ms. Nunez has 100% hearing in her right ear and 90% hearing in her left ear on word recognition testing. [R. 397].

The notes from Plaintiff's October 2015 physical exam with her primary care physician, Dr. Gentes, indicate that she had an annular tear in the lumbar region of her back that she was scheduled to treat with physical therapy. [R. 302]. In addition to physical therapy, Dr. Gentes recommended regular exercise and increased weight bearing activity. [R. 306]. The exam also reiterates that her depression worsened after her father died, her son went to jail, and she lost her job. [R. 306].

Dr. Gentes changed her antidepressant and referred her to psychiatrist Dr. Javier Lopez. *Ibid.*

During her November 2015 office visit with Dr. Gentes, her mood and affect were normal, but she had decreased sensation in her right foot and no sensation in her hands. [R.298]. Dr. Gentes noted that her neurological exam was "confusing" and referred her to a neurologist. *Ibid.*

Ms. Nunez was examined by neurologist Dr. Yaniv Chen in November 2015 and January 2016 after her back pain did not improve with physical therapy. [R. 332-38]. All of her mental status and neurological exams were normal. *Ibid.* Dr. Chen concurred on the diagnosis for the lumbar pain, citing the earlier MRI findings, and also diagnosed her with fibromyalgia. [R. 337]. Thereafter, she continued physical therapy until March 2016. [R. 339-362]

Ms. Nunez treated with Dr. Javier Lopez for anxiety and depression beginning in April 2016 and was seen on a monthly or bi-monthly basis thereafter. [R. 534]; [R. 677]. In her initial assessment, Dr. Lopez noted that Ms. Nunez had a history of suicidal ideation, but no intent or prior attempts. [R. 677]; [R. 683].

On June 28, 2016, Ms. Nunez was seen in the emergency room for dizziness. [694-98]. Her neurological and psychiatric exam was normal; her strength was rated 5/5, equal in all extremities; and she had a normal mood and affect. [R. 697]. At her next appointment with Dr. Lopez a month later, her depression and anxiety were moderate and improving. [R. 699-703]. She improved further the following month. [R.703]; [R.545].

But her mental health condition worsened in October 2016. [R. 559-61]. She then stated that the June 2016 emergency room visit was actually caused by taking extra Klonopin as a suicide gesture.[4] *Ibid*. Her depression and anxiety continued to worsen in January and February 2017. [R. 564-68].

On March 31, 2017, her new primary care physician, Dr. Veronica Plasencia, completed a full physical exam. [R. 569-577]. The physical examination showed scoliosis and decreased range of motion of the left arm, with tenderness on palpation on the back of the left shoulder (R. 574). Her neurological exam was also positive for weakness and headaches. [R. 570]. After her physical examination, Ms. Nunez was transferred to Bridgeport Hospital because of severe depression with suicidal ideation with plans. [R. 575]. At the time, she had intrusive thoughts about suicide methods, but was not experiencing psychosis. [R. 582]. She was discharged ten days later. [R. 597]. She was improving at her next appointment with Dr. Lopez, three days later. [R. 597-601].

The following month, Ms. Nunez reported her depression lessening, but anxiety increased. [R. 605]. In her next visit with Dr. Plasencia, no neurological symptoms presented. [R. 609-10]. Dr. Plasencia recommended regular exercise. [R. 612]. In June 2017, Dr. Lopez recommended "finding things to do during the day so that she has a reason to get up in  the morning-volunteering, exercise, walking." [R. 613]. In July 2017, her anxiety and mood worsened, although Dr. Lopez still

---

[4] Kolonopin is the brand name for clonazepam. The drug is a benzodiazepine and used to treat seizures and panic attacks.  *Clonazepam*, *MedLinePlus*, U.S. NAT'L LIBRARY OF MED., https://medlineplus.gov/druginfo/meds/a682279.html (last revised 06/15/2017).

classified her Generalized Anxiety Disorder and Major Depressive Disorder as "moderate." [R. 626]. There were no subsequent hospitalizations or inpatient treatment.

### III.    Medical opinions

Ms. Nunez submitted medical source statements from Dr. Lopez [R. 533-39] and Dr. Plasencia [R. 541-44]. She also submitted a medical source from an unidentified physician. [R. 526-530]. The ALJ considered the consultative examination report from Dr. Jesus A. Lago. [R. 290-294]. The ALJ also briefly considered the opinions of state agency examiners: Dr. Thomas Hill [R. 76-77], Dr. Judy Kleppel [R. 79-81], Adrian Brown, Ph.D. [87-90], and Dr. Abraham Bernstein [R.90-94].

### A.  Dr. Lopez's opinion

Dr. Lopez's opinion, dated August 28, 2017, indicates that Ms. Nunez is diagnosed with moderate Major Depressive Disorder and Generalized Anxiety Disorder with a fair prognosis. [R. 534]. On the contrary, he also opined that "extreme anxiety persists" and she has no useful ability to complete a normal workday or workweek without interruptions from psychological symptoms and cannot deal with normal work stress. [R. 536]. He opined that she had no useful ability to set realistic goals or make plans independently, is unable to deal with the stress of semiskilled or skilled work or with the stress of dealing with the general public. [R. 537].

### B. Dr. Plasencia's opinion

Dr. Plasencia's opinion, dated September 12, 2017, suggests serious physical limitations. [R. 541-545]. She opines that the Plaintiff has a limited range of motion in her left shoulder and multiple soft-tissue tender points. [R. 541]. Dr. Plasencia thrice states, "patient feels she cannot work." [R. 542];[R.544]. The doctor also opines that Plaintiff could sit or stand no more than 10 minutes at a time, that she can use her hands or fingers less than 10% of an 8-hour workday and would be off task greater than 25% of the time. [R.542-44].

### C. Dr. Lago's opinion

Plaintiff was examined by Dr. Jesus Lago of Connecticut Disability Determination Services on January 30, 2016. [R. 291-94]. Dr. Lago found that Ms. Nunez demonstrates normal posture, normal gait, and was an excellent historian. [R. 291]. He notes that Ms. Nunez functions independently, cooks, cleans, performs chores, and takes care of her activities of daily living. [R. 292]. Her performance on the mental exam was excellent. [R. 293]. Dr. Lago opined that, "from a psychiatric standpoint, Ms. Nunez is capable of adopting to work setting [sic]." [R.293].

### IV.   The ALJ's decision [R. 17-29]

The ALJ found that Ms. Nunez met the insured status requirement of the Social Security Act through December 31, 2019. [R. 20]. The ALJ also found that the Ms. Nunez has not engaged in substantial gainful activity since the alleged onset date of April 10, 2014. *Ibid*. On the third element, the ALJ found that Ms. Nunez has the following medically determinable severe impairments that limit the ability to

perform basic work activities: L4-5 disc herniation, fibromyalgia, hearing loss, migraine headaches depressive disorder and panic disorder. *Ibid.* The ALJ found that Ms. Nunez's anemia did not raise to the level of a severe impediment because she reported feeling better after receiving intravenous iron infusions. *Id.* (citing to R. 371 (9/25/2015, hematology note)("feels better post IV iron")). He also found that Plaintiff did not have a diagnosis of arthritis based on objective medical evidence, but rather shoulder pain generally. *Id.* (citing to R. 720 (07/06/2017 note, "nontraumatic shoulder pain, left")).

The ALJ then determined that Ms. Nunez failed to show an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR § 404.1520(d), 404.1525, and 404.1526). [R. 20-22]. The ALJ considered listings 1.04(a), 2.10, 11.02(b) and 14.09 concerning Claimant's physical ailments, but found that none of her physical conditions satisfied the requirements of Appendix 1. [R. 21]

Then, the ALJ considered Claimant's mental health impairments under listings 12.04 and 12.06 but found that she could not satisfy the "paragraph B criteria." [R. 21] Paragraph B requires the claimant to show that the mental impairments result in at least one extreme or two marked limitations in a broad area of functioning. *Ibid.* The ALJ found that this criterion was not satisfied because the Claimant had a mild limitation in understanding, remembering, or applying information, and had a moderate limitation in three other functional areas. [R. 21-22]. Claimant could not

satisfy the "paragraph c" criteria, as she could perform a wide range of household tasks outside of a highly structured setting. [R. 22].

Next, the ALJ found that Ms. Nunez's medically determinable impairments could reasonably be expected to cause her symptomology, but that her testimony concerning the intensity, persistence, and limiting effect of these symptoms was not entirely consistent with the medical evidence. [R. 24]. Thus, Ms. Nunez could still perform light work, which included her former work as an office clerk. [R. 24-27].

Specifically, the ALJ cited medical records indicating that she had full strength, a normal range of motion, and normal gait. [R. 24](citing R. 332, 11/18/2015 note). Her clinicians also recommended that she increase her activity level. [R. 24]. The ALJ considered her minor hearing loss but noted that there was no evidence that her hearing loss would result in any communication deficiency. [R. 25]. He noted that there was no on-going treatment for headaches. *Ibid*. He noted that Ms. Nunez's testimony that she had difficulty focusing was contradicted by clinical observations. [R. 25]. The ALJ addressed her psychiatric hospitalization, noting that Ms. Nunez was stable at discharge and without cognitive impairment. [R. 25-26](citing R. 593, 04/10/2017 hospital discharge note).

The ALJ placed great weight on Dr. Lago's consultative report, notably, Dr. Lago's observation that Plaintiff has excellent memory and sustained concentration after clinical testing, and his opinion that she could adapt to a work

setting. [R. 26]. He also found that Dr. Lago's report was consistent with the medical record as a whole. *Ibid.*

The ALJ placed partial weight on the illegible impairment questionnaire because it aligned with Dr. Lago's observation and findings that Ms. Nunez retained the ability to perform work tasks and interact with others. *Ibid.*

The ALJ placed little weight on Dr. Lopez's opinion because it contrasted with Dr. Lopez's clinical notations and recommendations. *Ibid.* Of note, Dr. Lopez opined that Ms. Nunez had no ability to complete a workweek or make clinical decisions, but in his clinical notations he observed that she had fair judgment and her mood was stable. *Ibid.* He also found that Dr. Lopez's opinion that Ms. Nunez is seriously limited in interacting with others contradicted his recommendation that she expand her activities, including volunteering. [R. 26].

The ALJ placed little weight on Dr. Plasencia's opinion because the treatment relationship was only spanned six months. [R. 26-72]. Additionally, Dr. Plasencia's opinion relied on Ms. Nunez's own impressions about her work capacity, not clinical findings. [R. 27]  He also noted that her opinion contradicts her clinical notes observing full strength, normal gait, and a normal range of motion. [R. 27].

The ALJ rejected the state agency consultants' conclusion that Ms. Nunez's mental impairments were non-severe but found that the physical portions of the assessment were partially supported by the medical evidence. [R. 27]. He also considered, but placed limited weight on, Global Assessment Functioning Scores

throughout the claimant's medical file as they are no longer considered best practice because of they are inherently subjective determinations. *Ibid*.

Taking this data into consideration, the ALJ determined that Ms. Nunez's RFC includes environmental limitations, difficulty reaching with her left arm, and difficulty fingering and handling. [R. 27]. Because of moderate limitations in interacting with others, coupled with her minimal hearing loss, she was limited to frequent interactions with co-workers and limited interactions with the public. *Ibid*. He also found that she could sustain concentration and persistence for three to four hour periods and perform simple and detailed, but not complex tasks. *Ibid*.

During the hearing, the ALJ heard testimony from vocation expert Joseph L. Goodman. [R. 60-68]. Mr. Goodman testified about the physical and cognitive demands of Claimant's past work as an "office clerk," DOT number 219.362-010, both generally and as actually performed. [R. 61]. Mr. Goodman testified that an office clerk is classified as light work by the Dictionary of Occupational Titles, but Plaintiff performed it at a sedentary level. *Ibid*. Mr. Goodman opined that the requirements for this position would not exceed the hypothetical restrictions provided by ALJ from the RFC. [R.66].

Lastly, the ALJ applied Plaintiff's RFC to her past relevant work as an office clerk, which is a semiskilled, sedentary position with a light exertion level, and found that she could still perform that job, thus precluding her from disability benefits. [R. 27-28].

## Legal Analysis

1. ## Arguments

Ms. Nunez's petition for review raises four arguments for reversal and remand. First, Plaintiff argues that the ALJ erred in according too little weight to the opinion of two of Plaintiff's treating physicians, Dr. Javier Lopez and Dr. Veronica Plasencia. [Dkt. 15-1 (Pl. Mot. to Rev.) at 3-7]. Next, Plaintiff argues that the ALJ did not specifically consider the side effects of Plaintiff's medications. *Id.* at 7-8. Then, Plaintiff argues that the ALJ erred by failing to give her physicians' limitations of the vocation expert. *Id.* at 8-9. Lastly, Plaintiff argues that the ALJ was not properly appointed at the time the hearing was held. *Id.* at 9-10.

In response, the Commissioner argues that the ALJ's determination of Plaintiff's Residual Functional Capacity ("RFC") properly weighed Plaintiff's treating physicians' opinions that were inconsistent with treatment notes or relied on Plaintiff's subjective impressions. [Dkt. 16-2 (Def. Mot. to Affirm) at 5-11]. The Commissioner argues that the ALJ properly acknowledged Plaintiff's symptomology that was consistent with the medical record and noted that she experienced side effects of medication. *Id.* 12-14. Next, Commissioner argues that the hypothetical provided to the vocational expert properly included her limitations and symptoms from the RFC. *Id.* at 14-15. Lastly, the Commissioner argues that Plaintiff waived her appointment clause claim by not raising it to the agency during the administrative process. *Id.* at 15-23.

## 2. Standard of Review

A district court reviewing a final . . . decision [of the Commissioner of Social Security] pursuant to section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), is performing an appellate function." *Zambrana v. Califano*, 651 F.2d 842 (2d Cir. 1981). Thus, a "district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) (citing 42 U.S.C. § 405(g)). "Substantial evidence, in a social security disability benefits case, is more than a mere scintilla, and means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Halloran v. Barnhart*, 362 F.3d 28 (2d Cir. 2004). In reviewing the Commissioner's decision, the "[a district court] must consider the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Petrie v. Astrue*, 412 F. App'x 401, 403–04 (2d Cir. 2011) (quoting *Williams ex rel. Williams v. Bowen,* 859 F.2d 255, 258 (2d Cir. 1988)) (internal quotation marks omitted).

Further, if the Commissioner's decision is supported by substantial evidence, that decision will be sustained, even where there may also be substantial evidence to support the plaintiff's contrary position*. Santiago v. Colvin,* No. 3:14-CV-1956 (MPS), 2016 WL 777905, at *2 (D. Conn. Feb. 29, 2016). The ALJ need not reconcile "every conflicting shred of medical testimony… it is sufficient that the ALJ noted that he carefully considered the exhibits presented in evidence in reaching his decision." *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981).  Legal error alone is

enough, however, to overturn the ALJ's decision, even if the ALJ's decision is supported by substantial evidence. *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008); *Shaw*, 221 F.3d at 131; *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987).

"When a plaintiff proceeds *pro se*, this Court affords his complaint "special solicitude" and interprets it to raise "the strongest claims that it suggests."' *Ramos v. Astrue*, No. 11 CIV. 6204 BMC, 2012 WL 2358158, at *1 (E.D.N.Y. June 20, 2012) (quoting *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir.2011)).

### 3. <u>Legal Standard for SSA Disability</u>

The Social Security Act (the "Act") establishes that benefits are payable to individuals who have a disability. 42 U.S.C. § 423(a)(1). To be "disabled," as defined by the Act, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve (12) months." 42 U.S.C. § 423(d)(1)(A). In order to determine whether a claimant is disabled within the meaning of the Act, the ALJ must follow a five-step evaluation process as promulgated by the Commissioner:

1. At the first step, we [the Commissioner] consider your [the Claimant] work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. (See paragraph (b) of this section.) ("Step One") ;

2. At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in § 404.1509, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. (See paragraph (c) of this section.) ("Step Two") ;

3. At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled. (See paragraph (d) of this section.) ("Step Three");

4. At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. See paragraphs (f) and (h) of this section and § 404.1560(b)("Step Four"); and

5. At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled. See paragraphs (g) and (h) of this section and § 404.1560(c) ("Step 5").

20 C.F.R. § 404.1520).[5]

At issue here is the ALJ's decision at Step Four. The ALJ determines the claimant's RFC by assessing the claimant's capacity to work, taking into consideration the extent to which the claimant's impairment(s) and related symptoms limit what the claimant can do in a work setting. 20 C.F.R. §§ 404.1545; 404.1546. RFC is a comprehensive "assessment based upon all of the relevant evidence . . . [which evaluates a claimant's] ability to meet certain demands of jobs, such as physical demands, mental demands, sensory requirements, and other functions." 20 C.F.R. § 220.120(a).  An ALJ must consider both a claimant's severe

---

[5] If the claimant meets the burden of proving the requirements in the first four steps, the burden then shifts to the Commission in the fifth step to show that the claimant is capable of alternative substantial gainful employment in the national economy. *Rosa v. Callahan,* 168 F.3d 72, 77 (2d Cir. 1999) (internal citations omitted). Step Five is not at issue here because the ALJ determined that Plaintiff had the RFC to perform past work as an office clerk at Step Four.

impairments and non-severe impairments in determining his/her RFC. 20 C.F.R. § 416.945(a)(2).

"Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis." SSR 96–8p, 1996 WL 374184, at *2. "A 'regular and continuing basis' means eight (8) hours a day, for five (5) days a week, or an equivalent work schedule." *Id.*; *Cichocki v. Astrue*, 729 F.3d 172, 176 (2d Cir. 2013) (defining RFC as "an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continued basis") (quoting SSR 96–8p, 1996 WL 374184, at *1).

### 4. The Treating Physician Rule[6]

"[T]he opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." *Burgess*, 537 F.3d at 128 (2d Cir. 2008) (quoting 20 C.F.R. § 404.1527(d)(2)).

---

[6] As a preliminary matter, several relevant regulations, particularly those regarding the Commissioner's review of medical source evidence were amended effective March 27, 2017. The amended regulations only apply to claims filed on or after March 27, 2017. Therefore, the Court considers the regulations in effect when Ms. Nunez filed her claim on November 10, 2015. *See Velez v. Berryhill*, No. 3:18CV01024(SALM), 2019 WL 2052013, at *2 n.3 (D. Conn. May 9, 2019), *see also* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 FR 5844-0.

"The regulations further provide that even if controlling weight is not given to the opinions of the treating physician, the ALJ may still assign some weight to those views and must specifically explain the weight that is actually given to the opinion." *Schrack v. Astrue*, 608 F. Supp. 2d 297, 301 (D. Conn. 2009) (citing *Schupp v. Barnhart,* No. Civ. 3:02CV103(WWE), 2004 WL 1660579, at *9 (D. Conn. Mar. 12, 2004)). It is "within the province of the ALJ to credit portions of a treating physician's report while declining to accept other portions of the same report, where the record contained conflicting opinions on the same medical condition." *Pavia v. Colvin*, No. 6:14-cv-06379 (MAT), 2015 WL 4644537, at 4 (W.D.N.Y. Aug. 4, 2015) (citing *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002)). If the ALJ gives the medical opinion less than controlling weight, the ALJ must consider the examining relationship, the treatment relationship, the length of treatment, the nature and extent of treatment, evidence in support of the medical opinion, consistency with the record, specialty in the medical field, and any other relevant factors. 20 C.F.R. § 404.1527.

### A. ALJ's placement of little weight on Dr. Lopez's opinion

Here, Plaintiff argues that "no factors were cited by the ALJ in determining that the opinions should be given little weight." [Dkt. 15 (Pl. Mot. for Remand) at 7]. This assertion is factually inaccurate. The ALJ's opinion expressly states that he placed little weight on Dr. Lopez's opinion because it contradicted his clinical notations, citing to specific examples. [R. 26].

A searching review of the record reveals that the ALJ did not "explicitly consider" other relevant *Burgess* factors. For example, the ALJ did not take Dr. Lopez's specialization in psychiatry or the length of the treatment relationship into account. That was a procedural error pursuant to *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013) (per curiam) and is reviewed for harmless error. As the Second Circuit held in *Estrella v. Berryhill*, 925 F.3d 90, 96 (2d Cir. 2019), if "the Commissioner has not [otherwise] provided 'good reasons' [for its weight assignment]," we are unable to conclude that the error was harmless and consequently remand for the ALJ to "comprehensively set forth [its] reasons." If, however, "a searching review of the record" assures us "that the substance of the treating physician rule was not traversed," we will affirm." (quoting *Halloran*, 362 F.3d at 32-33).

Here, the Court concludes the ALJ's decision to place little weight on Dr. Lopez's opinion is supported by substantial evidence, and thus the failure to expressly address all relevant *Burgess* factors was harmless.

The ALJ found that Dr. Lopez's opinion that Ms. Nunez had little to no ability to complete a workweek contradicted his clinical notations that she had fair judgment and mood stabilization with treatment. [R. 26]. The ALJ cites Ms. Nunez's hospital discharge note showing that she was stable [R. 593], Dr. Lopez's clinical observation from July 2017 indicating that her judgment was fair [R. 626], and that she was unmotivated to participate in therapy [612-13]. Additionally, the ALJ found that Dr. Lopez's opinion that Ms. Nunez would be frequently absent and have

difficulty interacting with others was contradicted by his recommendation that she increase her social activities. [R. 613].

Cognitively, Dr. Lopez and other providers opined that Ms. Nunez was fully oriented during their examinations, with normal concentration and fair judgment. [R. 560] (Dr. Lopez, 10/24/2016); [R. 564] (Dr. Gentes, 01/03/2017); [R. 606] (Dr. Lopez, 05/03/2017]); [R. 610] (Dr. Plasencia, 05/12/2017)("There is anxiety and depression…no decrease of concentration, no figety (sic)"). Cognitive testing by consultative examiner Dr. Lago and by treating neurologist Dr. Chen both produced normal results. [R. 334](Dr. Chen, 01/05/2016)("attention normal, concentration abilities normal…patient can spell "world" backwards or/and can subtract serial 7s appropriately."); [R. 293](Dr. Lago, 01/29/2016)(same). The ALJ also noted that Plaintiff's brain MRI was normal. [R. 26](citing to R. 397)].

The ALJ's findings are consistent with other parts of Claimant's treatment records with Dr. Lopez, which evaluate her anxiety and depression as recurrent, but moderate, even after her inpatient psychiatric hospitalization. *See e.g.* [R. 612](06/09/2017)("severity: mild to moderate"). Similarly, as the ALJ pointed out, none of Dr. Lopez's treatment notes reflect problems with social interaction. [R. 26].

The ALJ took necessary steps to reconcile longitudinal inconsistencies in Ms. Nunez's mental health. *See Estrella*, 925 F.3d at 97. This is especially important because "[c]ycles of improvement and debilitating symptoms [of mental illness] are a common occurrence, and in such circumstances it is error for an ALJ to pick

out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working." *Ibid*. (quoting *Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir. 2014). The ALJ expressly considered Plaintiff's worsening anxiety, then hospitalization, stabilization, and subsequent improvement. [R. 25]. Unlike *Estrella*, the ALJ did not "cherry-pick" a few instances of improvement in the clinical notes, but instead considered the general consistency across several clinician's findings of normal cognition and stabilized mood over time. *See* [R.25-26].

Here, remand for the procedural error is unnecessary because a searching review of the record otherwise provides "good reasons" for assigning little to Dr. Lopez's opinion.

### B. ALJ's placement of little weight on Dr. Plasencia's opinion

The ALJ explained that he placed little weight on Dr. Plasencia's opinion because she only treated Ms. Nunez for six months, that she relied on Ms. Nunez's own subjective impressions that she cannot work which are unsupported by objective medical evidence, and her opinion is beset by her medical notations that Ms. Nunez has full strength, normal gait, and a normal range of motion. [R. 27].

Again, although the ALJ did not expressly address all of the *Burgess* factors, the ALJ did not traverse the treating physician rule because he provided "good reasons" for applying little weight to Dr. Plasencia's opinion because it was inconsistent with the record as a whole, including Dr. Plasencia's own treating notes. *See Cichocki v. Astrue*, 534 F. App'x 71, 75 (2d Cir. 2013).

Dr. Plasencia examined Ms. Nunez five times during the relevant period, but each time, Dr. Plasencia's notes generally reflect full strength, normal gait, and normal range of motion. [R. 569-577](03/31/17, except for left shoulder); [R. 601-602](04/14/2017); [R. 608-612](05/12/2017, no back pain, no gait problems, no neck problems, left shoulder arthralgias), [R. 620-623](07/11/2017, not addressed); [R. 628-632](07/25/2017, not addressed).   The ALJ also contrasted Dr. Plasencia's opinion with assessments by Dr. Gentes, Ms. Nunez's prior primary care physician, [R. 553, 10/20/2016], and neurologist Dr. Chen (R. 334, 01/05/2016), both finding normal gait and strength on examination. Dr. Plasencia's May 12, 2017 clinical notes indicate that Ms. Nunez has full range of motion in all four extremities and she recommended regular exercise. [R. 608-612]. This contrasts starkly with Dr. Plasencia opinion that Plaintiff could sit or stand for no more than 10 minutes at a time and that she can use her hands or fingers less than 10% of an 8-hour workday. [R.542-44].

Additionally, as the ALJ noted, Dr. Plasencia's opinion contains the qualification that "patient feels she cannot work" [R. 27]. It appears twice at [R. 542] and once more at [R. 544]. The three questions in the form medical source statement pertain to how often Ms. Nunez would be "off-task" in a work environment. *Ibid*. This is significant in distinguishing between clinical observations or diagnostic testing results and a recitation of Ms. Nunez's subjective complaints. A treating physician's opinion based on a claimant's complaints are not entitled to the deference. Only those opinions of a treating

physician supported by objective medical evidence are entitled to deference. 20 C.F.R. § 404.1527(c)(2)-(3).

Although the ALJ did not expressly consider the frequency of treatment with Dr. Plasencia, any specific treatment or diagnostic techniques that she employed, or whether she had any expertise, the ALJ did not discount her opinion based on these factors; instead the ALJ considered the totality of the treatment record and her treatment notes in evaluating her opinion. [R. 34]. Despite the failure to expressly address the *Burgess* factors, the substance of the treating physician rule was not traversed because Dr. Plasencia's opinion was inconsistent with the record as whole, especially considering contrary neurocognitive findings and her own examination and history notes. *See Halloran*, 362 F.3d at 28 ("the opinion of the treating physician is not afforded controlling weight where, as here, the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts."). Therefore, the ALJ did not err in affording Dr. Plasencia's opinion little weight.

### C. Other medical evidence issues

Ms. Nunez argues that the ALJ failed to address Plaintiff's left shoulder, which causes chronic pain. [Dkt. 15 (Pl. Mot. to Reverse) at 8). But, the ALJ expressly considered her rheumatologist's notes about her left shoulder pain and "included the limitation for no overhead lifting with the left arm to account for her left shoulder pain in the context of fibromyalgia." [R. 20].

5. <u>**Consideration of the side effects of medication**</u>

Ms. Nunez argues that the ALJ failed to consider the effects of her medication, which are noted in Dr. Plasencia's medical opinion. [R. 541]("Due to psych. meds feeling tired…she takes them for instance Klonopin 3 times/day and feels tired…").

In evaluating pain symptoms the ALJ must consider the "type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms." 20 C.F.R. § 404.1529(c)(3)(iv). Here, the ALJ referenced the fact that "claimant testified that she takes medication for the condition [body pain and depression] but that she experiences side effects." [R. 23].

During the hearing, Ms. Nunez testified that she suffered from drowsiness, nausea, and dizziness, which she attributed to her medications. [R. 56]. However, there is no medical evidence to support her argument that the side effects from her medication were disabling. Moreover, Dr. Plasencia's opinion states that she "feels tired," not exhausted or lethargic. *Ibid.*

Per Dr. Lopez's clinical notes, she suffered from nightmares when taking Ambien but told to stop taking the medication if sleep improved, which she discontinued accordingly. [R. 600]; [R. 605]. She slept well with Klonopin. [R. 677]. She also tolerated Wellbutrin SR. [R. 699]. Dr. Plasencia's clinical notes do not reflect any persistent debilitating side-effects of claimant's medication, but rather state that she is feeling better with a new medication regimen. [R. 601]. Thus, Dr. Plasencia's opinion on the effect of Plaintiff's medication does not warrant

deference because it is inconsistent with the record as a whole, to the extent it would warrants rendering her disabled, which it does not.

The Court finds that the ALJ's RFC determination is supported by substantial evidence because Plaintiff's claim that her medications rendered her disabled is not supported by the record.

6. <u>Information provided by the ALJ to the vocational expert</u>

Ms. Nunez argues that Dr. Lopez and Dr. Plasencia's opinions were not provided to the vocational expert. But the role of the vocational expert is "to assist the ALJ in determining what jobs Plaintiff can perform based on the RFC, not to determine the RFC." *Diaz v. Berryhill*, No. 3:17-CV-00735 (JCH), 2018 WL 4462366, at *9 (D. Conn. Sept. 18, 2018) (citing *Tompkins v. Colvin*, No. 13CV911, 2015 WL 10382575, at *7 (W.D.N.Y. Dec. 23, 2015), *report and recommendation adopted*, No. 13-CV-911, 2016 WL 792428 (W.D.N.Y. Mar. 1, 2016). Here, the vocational expert testified about the demands of Plaintiff's former relevant work as an office clerk. The ALJ then provided the vocational expert a set of hypothetical limitations derived by the ALJ from the RFC. [R. 61-63]. The vocational expert then opined that a person with those hypothetical limitations could perform work as an office clerk. [R. 62].

Thus, the ALJ did not err by failing to provide clinical documentation or medical opinions to the vocational expert because there was no reason to do so, given the scope of the vocational expert's duties. For reasons previously discussed, the Court finds that the ALJ's RFC determination is supported by substantial evidence.

### 7.  The Appointment of the ALJ

Plaintiff argues that a new hearing is necessary under the U.S. Supreme Court's holding in *Lucia v. S.E.C.*, 138 S. Ct. 2044 (2018) because ALJ Boyd was not appointed as an Officer of the United States at the time he issued his decision, in violation of the Appointments Clause. [Dkt. 15 (Pl. Mot. to Reverse) at 9].

The Appointments Clause of the U.S. Constitution states, in relevant part, "but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. CONST. art. II, § 2, cl. 2. The distinction between Inferior Officers of the United States, who must be appointed by a cabinet-level official, and federal employees rests on the power the individual wields. *Lucia*, 138 S. Ct. at 2051.

On June 21, 2018 in *Lucia*, the U.S. Supreme Court held that Securities and Exchange Commission's ALJ are "Officers of the United States, subject to the Appointments Clause." 138 S. Ct. at 2055. *Lucia* explains that the SEC had five ALJs that presided over adversarial enforcement actions, each selected by staff members under merit-selection rather than by the Commission proper. 138 S. Ct. at 2049. An ALJ assigned to hear an SEC enforcement action has the "'authority to do all things necessary and appropriate to discharge his or her duties" and ensure a "fair and orderly" adversarial proceeding." *Ibid*; 17 C.F.R. §§ 201.111, 200.14(a). An SEC ALJ has the power to impose sanctions for contemptuous conduct or violations of procedural requirements, supervise discovery, and decide evidentiary issues. 138 S. Ct. at 2049. (citations and quotations omitted). The ALJ then renders an "initial decision," which is reviewable by the Commission by request or *sua*

*sponte*. *Ibid.*; 17 C.F.R. § 201.360(d)(1). The ALJ's decision becomes final if the Commission declines to review it and it is deemed the action of the Commission. 138 S. Ct. at 2049; 17 C.F.R. § 201.360(d)(2). In practice, the Commission's acceptance of credibility judgments by the ALJ was "near-automatic," so the ultimate decision generally rested with the ALJ. *Lucia*, 138 S. Ct. at 2054-2055.

Previously, in *Freytag v. Commissioner*, 501 U.S. 868 (1991), the Supreme Court applied the "significant authority" test from *Buckley v. Valeo*, 424 U.S. 1 (1976) to hold that "special trial judges" of the United States Tax Court were subject to the Appointments Clause because they held a continuing office established by law, they had significant responsibilities in presiding over adversarial proceedings, and could exercise significant discretion in that function. *Freytag*, 501 U.S. 881-82. In *Lucia*, Supreme Court, analogizing "special trial judges" of the United States Tax Court to the SEC ALJs, held that the SEC ALJ's were appointed in violation of the Appointment Clause. *Lucia*, 138 S. Ct., at 2053. ("So point for point—straight from *Freytag* 's list—the Commission's ALJs have equivalent duties and powers as STJs [Tax Court Special Trial Judges] in conducting adversarial inquiries.").

In *Lucia*, the Supreme Court held that the appropriate remedy for an Appointments Clause violation is a new hearing held before a properly appointed official who has not previously heard the case on the merits. *Id.* at 2055. The Supreme Court also held that '"one who makes a *timely* challenge to the constitutional validity of the appointment of an officer who adjudicates his case" is entitled to relief." *Ibid.* (quoting *Ryder v. United States*, 515 U.S. 177, 177 (1995)(emphasis added).

In response to *Lucia*, on July 10, 2018, the President of the United States issued Executive Order 13843, titled "Excepting Administrative Law Judges from Competitive Service," thereby exempting all ALJs appointed under 5 U.S.C. § 3105 from competitive selection and examination, pursuant to authority vested in the President by 5 U.S.C. § 3302(1). Exec. Order No. 13843, 83 FR 32755 (2018). Acting Social Security Commissioner ratified the appointments of ALJs and the appeals judges at the Appeals Council on July 16, 2018. 84 Fed. Reg. 9582-02. Social Security Emergency Message (EM) 18003 REV 2, § B Social Security Ruling 19-1p; Titles II and XVI: Effect of the Decision in *Lucia v. Securities and Exchange Commission* (SEC) On Cases Pending at the Appeals Council, 84 FR 9582-02. Thus, at the time ALJ Boyd rendered his decision, he was not an Officer of the United States, subject to the Appointments Clause. *See supra* 2.

*Lucia*, however, does not precisely answer the two questions posed here: first, were the Social Security Administration's ALJs improperly appointed as employees, rather than Officers of the United States, before July 16, 2018, and  if so, did Plaintiff waive her objection by not raising it before the ALJ?

The first issue is resolved in the claimant's favor by the Commissioner's concession that *Lucia*'s reasoning applies to the SSA's ALJs. The Commissioner notes that "…*Lucia* does not directly address the constitutional status of administrative law judges appointed under 5 U.S.C. § 3105 who, like SSA ALJs, do not possess powers equivalent to those of the SEC ALJs." [Dkt. 16 (Def. Mot. to Affirm) at 16, n. 10]. SSA ALJ's do not preside over adversarial proceedings. Their role is investigatory and they are charged with developing the record and retaining

experts to opine on factual issues informing the ALJ's decision. But, for purposes of the brief, the Commissioner "does not argue that SSA ALJs are employees rather than inferior officers." *Ibid*. Thus, the Court assumed for purposes of this decision that SSA ALJs were appointed in violation of the Appointment Clause and therefore the claimant is entitled to a new hearing before a duly appointed ALJ who did not decide the case initially if she raised a timely objection.

Turning to the timeliness of claimant's objection, Plaintiff, who was represented by counsel, did not raise an Appointments Clause challenge during her hearing before the ALJ [R. 35-68] or in her pre-hearing brief. [R. 283-284]. The sole item on Appeals Council's exhibit list shows that they received a request for review on November 17, 2017. [R. 4]; [R. 196-199].[7] Even after *Lucia* was decided, the only issue before the Appeals Council concerned the weight placed on the claimant's primary treating physicians and the medical evidence. [R. 197].

There is no controlling Second Circuit precedent on point. The vast majority of the considerable number of district courts, including all other judges in this District who have considered the issue, have concluded a plaintiff waives her Appointments Clause challenge under *Lucia* when she does not raise it during the Commissioner's agency proceedings. *See Streich v. Berryhill*, No. 3:18-CV-01977(RAR), 2020 WL 563373, at *3 (D. Conn. Feb. 5, 2020); *Mungin v. Saul*, No. 3:19

---

[7] One of the four pages received by the Appeals Council was a requested extension from Attorney Sonje Williams so that she could file a brief and submit additional exhibits. [R. 198]. The exhibit list, however, reflects that no additional information was received by the Appeals Council. [R. 5]. A brief is permitted, but not required under the SSA's regulations, even when the Appeals Council grants review. 20 C.F.R. § 404.975; *see also Sims v. Apfel*, 530 U.S. 103, 111(2000)

CV 233 (RMS), 2020 WL 549089, at *4 (D. Conn. Feb. 4, 2020); *Byrne v. Berryhill*, No. 3:19-CV-00066(RAR), 2020 WL 373076, at *3 (D. Conn. Jan. 23, 2020); *Demoranville v. Saul*, No. 3:18-CV-01930(RAR), 2019 WL 6712056, at *3 (D. Conn. Dec. 10, 2019); *Caruso v. Saul*, No. 3:18 CV 1913 (RMS), 2019 WL 5853527, at *13 (D. Conn. Nov. 8, 2019); *Debiase v. Saul*, No. 3:19 CV 68 (RMS), 2019 WL 5485269, at *4 (D. Conn. Oct. 25, 2019); *Johnson v. Berryhill*, No. 3:17-CV-1651 (VAB), 2019 WL 1430242, at *14 (D. Conn. Mar. 29, 2019); *see also Bonilla-Bukhari v. Berryhill*, 357 F. Supp. 3d 341, 351 (S.D.N.Y. 2019)(collecting cases).

An Appointments Clause objection is a "non-jurisdictional" structural challenge and can be considered on appeal whether or not they were raised below. *Freytag*, 501 U.S. at 878–79 ("*Glidden* expressly included Appointments Clause objections to judicial officers in the category of non-jurisdictional structural constitutional objections that could be considered on appeal whether or not they were ruled upon below.") (citing to *Glidden v. Zdanok*, 370 U.S. 530, 536 (1962)). The Supreme Court in *Freytag* exercised its discretion to decide an Appointments Clause challenge first raised on appeal because it was "…neither frivolous nor disingenuous…" and the "…the structural interests protected by the Appointments Clause are not those of any one branch of Government but of the entire Republic." *Id.* at 880. The Supreme Court noted that this was a "rare case" because the challenge went to the validity of the tax court proceeding and the interest of constitutional separation of powers warranted setting aside "sound appellate process." *Id.* at 879.

Then, four years later in *Ryder v. United States*, the Supreme Court reversed the Court of Military Appeals based on the petitioner's timely Appointment Clause

challenge to two of the civilian judges' appointments by the General Counsel of the Department of Transportation to the intermediate military appellate court. *Ryder*, 515 U.S. at 179. In noting his timely objection, the Supreme Court held that "… one who makes a timely challenge to the constitutional validity of the appointment of an officer who adjudicates his case is entitled to a decision on the merits of the question and whatever relief may be appropriate if a violation indeed occurred. Any other rule would create a disincentive to raise Appointments Clause challenges with respect to questionable judicial appointments." *Ryder v. United States*, 515 U.S. at 182–83. Notably, the plaintiffs in both *Lucia* and *Ryder* raised timely Appointments Clause challenges during the administrative process. See *Ryder*, 515 U.S. at 179; *Lucia*, 138 S. Ct. at 2055.

The de facto officer doctrine helps reconcile these cases. Under the de facto officer doctrine, "'…where there is an office to be filled and one, acting under color of authority, fills the office and discharges its duties, his actions are those of an officer de facto and binding upon the public.'" *Glidden Co.*, 370 U.S. at 535 (citing *McDowell v. United States*, 159 U.S. 596, 602, (1895)). "The rule is founded upon an obviously sound policy of preventing litigants from abiding the outcome of a lawsuit and then overturning it if adverse upon a technicality of which they were previously aware." *Ibid*. Thus, the distinction is drawn between mere technicalities, which can be forfeited on appeal, and those that "embod[y] a strong policy concerning the proper administration of judicial business,' which the Court will reach on direct review whether raised below or not." *Abbington v. Berryhill*, No. CV

1:17-00552-N, 2018 WL 6571208, at *7 (S.D. Ala. Dec. 13, 2018)(quoting *Glidden Co.*, 370 U.S. at 535-536).

Looking now to the procedures before the Social Security Administration ("SSA"), the Supreme Court in *Sims v. Apfel,* 530 U.S. 103, 112 (2000), held that a claimant need not exhaust review by the Appeals Council in order to preserve those claims for judicial review. "The Supreme Court declined to impose an exhaustion requirement due to the non-adversarial nature of Social Security proceedings and appeals, in which "[t]he [Appeals] Council, not the claimant, has primary responsibility for identifying and developing the issues.'" *See Vincent v. Comm'r of Soc. Sec.*, 651 F.3d 299, 306 (2d Cir. 2011) (citing *Sims*, 530 U.S. at 112). However, the plurality in *Sims* did not address a situation where the claimant did not raise the challenge before the ALJ. *Abbington*, No. CV 1:17-00552-N, 2018 WL 6571208, at *6; see also *Bonilla-Bukhari*, 357 F. Supp. 3d at 350.

The Court joins other courts in this circuit in adopting the reasoning of the agrees with the persuasive reasoning of the South District of Alabama in *Abbington v. Berryhill,* CV 1:17-00552-N, 2018 WL 6571208, at *7 (S.D. Ala. Dec. 13, 2018) on the issue of waiver of an Appointments Clause challenge not raised before the SSA ALJ, which has since been adopted by several other district courts. *See, inter alia, Bonilla*-Bukhari, 357 F. Supp. 3d at 351("We find the reasoning of *Abbington* to be helpful and persuasive."); *Sprouse v. Berryhill*, 363 F. Supp. 3d 543, 549 (D.N.J. 2019); *Muhammad v. Berryhill*, 381 F. Supp. 3d 462, 469 (E.D. Pa. 2019)(declining to accept magistrate judge's recommendation to remand to a new SSA ALJ under *Lucia*).

The district court in *Abbington* reasoned that the objection to the appointment process for an SSA ALJ is not one of the "rare cases," like *Freytag*, warranting deviation from the de facto officer doctrine, especially in light on *Ryder* and *Lucia's* most recent emphasis on the timeliness of the Appointments Clause challenge, and given the inquisitorial, rather than purely adjudicative role of the ALJ in Social Security proceedings. *Abbington* at 2018 WL 6571208, at 7. Additionally, excusing waiver the policy aim of prompting challenges to questionable judicial appointments as early as possible, which was endorsed in *Lucia,* 138 S. Ct., at 2053 and *Ryder*, 515 U.S. at 182-83.

As Justice Scalia reasoned in his concurrence in *Freytag*, an exception to the *de facto* officer rule would "encourage the practice of "sandbagging": suggesting or permitting, for strategic reasons, that the trial court pursue a certain course, and later—if the outcome is unfavorable—claiming that the course followed was reversible error." *Freytag*, 501 U.S. at 895. (Scalia, J., concurring in part and concurring in judgment).

Even before *Lucia* was decided, the argument that merit-based appointment of ALJs under the Administrative Procedures Act violated the Appointments Clause was already in the public space and available to counsel and lay persons. *See* Kent Barnett, *Resolving the ALJ Quandary*, 66 Vand. L.R. 797 (2013)(free public access available at [https://digitalcommons.law.uga.edu/fac_artchop/893](https://digitalcommons.law.uga.edu/fac_artchop/893)). Other district courts have noted that the Appointments Clause argument was "available" to counsel by virtue of the U.S. Supreme Court's prior decisions in *Freytag* (1991) and

*Ryder* (1995). *See Kevin F. v. Comm'r of Soc. Sec.*, No. 5:18-CV-1454 (ATB), 2020 WL 247323, at *7 (N.D.N.Y. Jan. 16, 2020).

The Court, therefore, joins the overwhelming majority of district courts finding that failure to raise an Appointments Clause challenge before the ALJ in a social security disability proceeding waives it for judicial review.

<u>Conclusion</u>

For the aforementioned reasons, the Court DENIES the Plaintiff's Motion for Remand, [Dkts. 15, 17], and GRANTS the Commissioners Motion to Affirm, [Dkt. 16]. The Clerk is directed to close this case.

**IT IS SO ORDERED.**
**At Hartford, Connecticut**

*Vanessa Lynne Bryant*

Vanessa Bryant
2020.02.28 10:32:23 -05'00'

**Hon. Vanessa L. Bryant**
**United States District Judge**